1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD F. MARTINEZ, | 1:11-cv-00293-LJO-DLB (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECCOMMENDING GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| K. ALLISON, et al., | (ECF No. 64) |
| Defendants. | FOURTEEN-DAY OBJECTION PERIOD |

Plaintiff Ronald F. Martinez ("Plaintiff"), a state prisoner proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983 on February 18, 2011.  Plaintiff filed a First Amended Complaint ("FAC") on September 30, 2011.  ECF No. 9.  On February 13, 2012, the Court found cognizable claims against 1) Defendants Vasquez, T. Wan, C. Moreno, R. Tolsen, B. Peterson, Clark, Allison, R. Diaz, S. Sherman, and Does 1 through 10 for deliberate indifference in violation of the Eighth Amendment for deprivation of exercise and 2) Vasquez, Moreno, Tolsen, Peterson, Clark, Allison, Diaz, Sherman, A. Hernandez, Gomez, and Does 1 through 10 for violation of the Equal Protection Clause of the Fourteenth Amendment.[1]  ECF No. 12.

---

[1] Defendant Gomez was dismissed from this action on March 25, 2013, pursuant to a statement noting his death. ECF No. 52.

On July 15, 2013, Defendants filed this Motion for Summary Judgment.[2]  ECF No. 64. Plaintiff opposed the motion on August 28, 2013, and Defendant filed his reply on September 30, 2013.  ECF Nos. 72 & 79.  On October 18, 2013, Plaintiff filed a surreply that the Court did not consider.[3]  ECF No. 80.  The motion is deemed submitted pursuant to Local Rule 230(*l*).

## I.    LEGAL STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  *Id.* at 324.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Id.* at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.*  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule

---

[2]  In Defendant's Notice of Motion dated June 28, 2013, Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment.  *Klingele v. Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

[3]  Parties do not have the right to file surreplies and motions are deemed submitted when the time to reply has expired.  Local Rule 230(*l*).  The Court generally views motions for leave to file a surreply with disfavor.  *Hill v. England*, No. CVF05869 REC TAG, 2005 WL 3031136, at *1 (E.D. Cal. 2005) (citing *Fedrick v. Mercedes-Benz USA, LLC*, 366 F.Supp.2d 1190, 1197 (N.D. Ga. 2005)).

56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586, n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2002); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting former Rule 56(e) advisory committee's note on 1963 amendments).

In resolving a motion for summary judgment, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587 (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962) (per curiam)).

Finally, to demonstrate a genuine dispute, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 586-87 (citations omitted).

## II.    UNDISPUTED FACTS[4]

### THE PARTIES

Plaintiff Ronald F. Martinez (T-86494) is an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR). (1st Am. Compl., ECF No. 9 at 1.)  He is currently housed at Salinas Valley State Prison. (Pl.'s Notice of Change of Address, ECF No. 17.)  From September 2008 to October 13, 2010, Plaintiff was housed in SATF's Facility C. (1st Am. Compl., ECF No. 9 at 5.)  Plaintiff became affiliated with the Watts Varrio Grape Street gang as a pre-teen.  (Martinez Depo. 13:14-24, 14:14-17.)  The Watts Varrio Grape Street gang is based out of Los Angeles, and it has a symbiotic relationship with the Mexican Mafia prison gang. (Valdez Decl. ¶ 31.)   Based on his street gang activity, Plaintiff was designated as a Southern Hispanic (Sureño) disruptive group affiliate when he was processed into the CDCR system in 2003.  Plaintiff has remained designated as a Southern Hispanic ever since 2003. (Martinez Depo. 33:9-13.)  Several counseling chronos from Plaintiff's central file support his designation as a Southern Hispanic based on Plaintiff's in-prison behavior. (Valdez Decl. ¶

---

[4] Plaintiff attempts to take issue with a majority of defendants' undisputed facts; however, unless he provides some evidentiary basis for an objection to a fact for which defendants provide evidentiary support, the objection will be noted but found to be without merit and the fact at issue will be deemed undisputed.

30(d)-(g).)  None of the ten Defendants in this case were involved in designating Plaintiff as a Southern Hispanic. (Allison Decl. ¶ 65; Diaz Decl. ¶ 43; Hernandez Decl. ¶ 19; Moreno Decl. ¶ 20; Peterson Decl. ¶ 20; Sherman Decl. ¶ 42; Tolson Decl. ¶ 19; Vasquez Decl. ¶ 44; Wan Decl. ¶ 42.)

Defendant Clark served as Warden at SATF from 2005 to 2009. (Def. Clark's Resp. to Pl.'s Interrogatory 1, Set One; Def. Clark's Resp. to Pl.'s Interrogatory 2, Set Two.)  On June 22, 2009, he implemented the modified program at issue in this case.  (Allison Decl. ¶ 2 & Ex. A at PSR01.)  Approximately one week after implementing the modified program at issue, Warden Clark left SATF for a position at CDCR headquarters in Sacramento. (Allison Decl. ¶ 3.)

Defendant Allison served as Chief Deputy Warden at SATF from December 2007 to June 2009. (Allison Decl. ¶ 1.)  She became Acting Warden in late-June 2009, about one week after the modified program had been in effect, and she immediately assumed full responsibility for prison operations at SATF, including responsibility for overseeing the modified program at issue. (Allison Decl. ¶¶ 1, 5.)  Defendant Allison remained Warden throughout the rest of the complaint period (i.e., from June 22, 2009 to October 13, 2010). (Allison Decl. ¶ 1.)

Defendant Vasquez served as the lead Facility Captain for Facility C while the modified program at issue was in effect. (Vasquez Decl. ¶ 1.)  In this capacity, Defendant Vasquez gave Warden Allison daily updates on the status of the modified program. (Allison Decl. ¶¶ 34, 35.)  Defendant Vasquez also maintained a record of all significant events that pertained to the related investigation, newly discovered threats, and steps taken to safely return Facility C to normal programming. (Allison Decl. ¶ 35 & Exs. B, C; Vasquez Decl. ¶ 26 & Exs. A, B.)

During the complaint period, Defendant Sherman served as the Associate Warden in charge of Facility C, and he also served as the Chief Deputy Warden (Acting) as staffing needs required. (Sherman Decl. ¶ 1.)  In these roles, Sherman attended weekly meetings with Warden

Allison, and he provided updates and advice concerning the modified program. (Sherman Decl. ¶¶ 7, 24-25.)   Defendant Diaz served as the Chief Deputy Warden at SATF at various times during the complaint period. (Diaz Decl. ¶ 1.)   In this capacity, Diaz also attended weekly meetings with Warden Allison and provided updates and advice concerning the modified program. (Diaz Decl. ¶¶ 7, 25-26.)   Defendant Wan was the Associate Warden in charge of Facility C during parts of the complaint period. (Wan Decl. ¶ 1.)   As with Defendants Sherman and Diaz, Defendant Wan also attended weekly meetings with Warden Allison and provided updates and advice concerning the modified program. (Wan Decl. ¶¶ 7, 24-25.)

Defendant Moreno worked as a Correctional Lieutenant on Facility C during the complaint period. (Moreno Decl. ¶ 1.)   Moreno also served as an Acting Facility Captain as staffing needs required. (Moreno Decl. ¶ 1.)   Throughout the entire 16-month complaint period, Moreno attended just two of the Warden's weekly meetings. (Moreno Decl. ¶ 9.)   Moreno did not provide any input at either of these meetings. (Moreno Decl. ¶ 9.)   Moreno prepared a Program Status Report for the Chief Deputy Warden's review while she was serving as the Acting Facility C Captain one day in February 2010. (Moreno Decl. ¶ 14 & Ex. A.)   Defendant Hernandez worked as the Associate Warden in charge of Facility C from March 2010 to September 2010. (Hernandez Decl. ¶ 1.)   Hernandez does not recall attending any of the Warden's modified program meetings, and she does not recall providing any input regarding the modified program at issue. (Hernandez Decl. ¶ 8.)   In January 2010, Hernandez reviewed and approved a Program Status Report (PSR) relating to modified program SATF-03-09-06-0235, while she was filling in as the Administrative Officer of the Day. (Hernandez Decl. ¶ 13 & Ex. A.)   During the complaint period, Defendant Tolson served as the Custody Captain at SATF. (Tolson Decl. ¶ 1.)   Tolson attended three or four of the Warden's weekly meetings, but he did not provide any input concerning the modified program at any of these meetings. (Tolson Decl. ¶

6

8.)   Tolson prepared one PSR in connection with modified program SATF-03-09-06-0235. (Tolson Decl. ¶ 13.)  Defendant Peterson primarily worked as a Correctional Counselor at SATF in 2009-2010, but he filled in as an Acting Facility Captain from time to time. (Peterson Decl. ¶ 1.)  Peterson only attended one of the Warden's weekly meetings and he did not provide any input during this meeting. (Peterson Decl. ¶ 1.)  Peterson prepared one PSR, based on Warden Allison's instructions, while he was serving as an Acting Facility Captain for Facility C in August 2010. (Peterson Decl. ¶ 14 & Ex.A.)

**SATF'S FACILITY C**

SATF's Facility C is made up of eight identical buildings, or housing units (C1-C8). (Allison Decl. ¶ 10; Vasquez Decl. ¶ 8.)  Facility C is divided into equal halves by a retaining wall. (Allison Decl. ¶ 10; Vasquez Decl. ¶ 8.)  There are two large recreational yards that serve Facility C's inmate population during periods of normal programming. (Allison Decl. ¶ 10; Vasquez Decl. ¶ 8.)  The "lower yard" serves as the recreational area for inmates housed in Buildings C1-C4, while the "upper yard" provides recreational space for inmates housed in Buildings C5-C8.   (Allison Decl. ¶ 10.)  Each yard contains a basketball court, a baseball diamond, a soccer field with goals, a sand volleyball court, a handball court, a running track, four sets of chin-up and dip bars, tables with seats, drinking fountains, urinals, toilets, and sinks. (Allison Decl. ¶ 10.)  A retaining wall bisects Facility C.  (Vasquez Decl. ¶ 8.)  The retaining wall is a long, narrow structure that includes space for Facility C's law library, its medical and dental units, the chapel, and several program offices (i.e., offices for Correctional Captains, Lieutenants, and Sergeants). (Vasquez Decl. ¶ 8.)  Inmates from both upper and lower sides of Facility C use these common spaces at the same time. (Vasquez Decl. ¶ 8.)  All 8 of Facility C's housing units also have a small enclosed area, commonly referred to as a "concrete yard," that is approximately 2,400 square feet, or about the size of a basketball court. (Allison Decl. ¶ 11.)

These small yards have no recreation equipment, and they can only accommodate about 10-20 prisoners at a time. (Allison Decl. ¶ 11.)

General population inmates are classified as belonging to one of four different security levels, depending on their commitment offenses and in-prison behavior. (Allison Decl. ¶ 12; Vasquez Decl. ¶ 9.)  Level IV inmates pose the highest security risk among general population inmates.  (Allison Decl. ¶ 12; Vasquez Decl. ¶ 9.)  The majority of inmates housed on Facility C were there because they had demonstrated through their institutional behavior that they needed higher levels of custodial supervision than other Level IV inmates. (Allison Decl. ¶ 12; Vasquez Decl. ¶ 9.)  SATF's Facility C houses some of the most dangerous, and high-risk inmates in the CDCR system. (Allison Decl. ¶ 12.)  The majority of inmates on Facility C are actively involved in prison gangs or prison disruptive groups. (Allison Decl. ¶ 12.)  Facility C is the only Level IV maximum-security facility at SATF that houses general population inmates. (Allison Decl. ¶ 12.)

**MODIFIED PROGRAMMING**

Normal programming at a prison means inmates attend work and education programs; have regular visiting, canteen, and telephone privileges; can attend the law library and religious services; and are released to the yard for recreation in large groups according to their yard schedule. (Allison Decl. ¶ 13; Vasquez Decl. ¶ 10.)  During normal programming on Facility C, about 130 inmates at a time were allowed access to one of the two recreation yards for outdoor exercise. (Allison Decl. ¶ 13; Vasquez Decl. ¶ 10.)  A modified program typically involves the suspension of various programs and services for a specific group of inmates or a specific part of a facility. (Allison Decl. ¶ 14; Vasquez Decl. ¶ 11.)  CDCR deems that modified programs are necessary when correctional staff discover evidence or receive information that violence or disruptions are being planned by some inmates against other inmates or staff, or that there exists a serious threat to institutional security or the safety of inmates and staff. (Allison Decl. ¶ 14;

Vasquez Decl. ¶ 11.)  During periods of modified programming, work and education programs, visiting and dayroom privileges, and outdoor yard time may be suspended; telephone, canteen, and religious programming may be restricted. (Allison Decl. ¶ 14; Vasquez Decl. ¶ 11.) Essential services, including medical services, mental health services, and hygiene, are maintained. (Allison Decl. ¶ 14; Vasquez Decl. ¶ 11.)

When staff learn of a threat to institutional safety and security, after the initial incident response is completed and the situation stabilized, the incident is assessed to determine whether it is necessary to modify or restrict programming activities for some or all inmates. (Allison Decl. ¶ 20; Vasquez Decl. ¶ 14.)  After a precipitating event, the lockdown committee meets and assesses the overall safety and security risk, and it determines what areas of the prison are affected, which investigations must be conducted, whether to interview staff and inmates, and how to collect relevant intelligence. (Allison Decl. ¶ 20; Vasquez Decl. ¶ 14.)

If an incident is serious, it may be necessary to modify or restrict program activities for some or all inmates by: (1) declaring a State of Emergency; (2) locking down an entire facility or portions of a facility; or (3) placing some or all of the facility on a modified program.  (Allison Decl. ¶ 20; Vasquez Decl. ¶ 14.)  The lockdown committee submits a recommendation to the Warden, which may include a request to institute any one of these three security measures, and the Warden or his or her designee approves or rejects the recommendation. (Allison Decl. ¶ 20; Vasquez Decl. ¶ 14.)  Only the Warden, or his or her designee, has the authority to adjust or terminate a modified program once it has been implemented. (Allison Decl. ¶ 6; Vasquez Decl. ¶ 4.)  If a modified program is implemented in any form, it is assigned a Program Status Number. (Allison Decl. ¶ 21.)  The modified program is then referred to by this number in all related documents.  (Allison Decl. ¶ 21.)

The modified program at issue in this case was assigned Program Status Number SATF-03-09-06-0235. (Allison Decl. ¶ 21.)  At any time, a facility or housing unit can be operating under more than one modified program, each of which is designed to address a different security risk. (Allison Decl. ¶ 22.)  For instance, a housing unit could be operating under two separate modified programs at the same time—one affecting all Sureños, and the other affecting all Crips, with the rest of the inmate population remaining on normal programming—based on entirely different security threats involving Sureño and Crip inmates. (Allison Decl. ¶ 22.)  During a modified program, the Warden communicates with staff and the affected inmate population through periodic reports, called Program Status Reports (PSRs). (Allison Decl. ¶ 16.)

In this case, Warden Allison asked various high-level staff to prepare and approve the PSRs on her behalf. (Allison Decl. ¶ 17; Vasquez Decl. ¶ 13.)  Facility Captain Vasquez was charged with preparing individual PSRs, and at different times, Chief Deputy Warden (Acting) Sherman and Chief Deputy Warden Diaz were charged with approving them. (Allison Decl. ¶ 17; Vasquez Decl. ¶ 13.)  Various other high-level officials prepared or approved the PSRs when one of these men was unavailable. (Allison Decl. ¶ 17; Vasquez Decl. ¶ 13.)

CDCR's policy is to return to normal programming as soon as it is safe to do so.  (Allison Decl. ¶ 27; Vasquez Decl. ¶ 19.)  Gathering information about the cause(s) of violence, any significant security breaches that have occurred, or the plans for committing acts of violence, is imperative so that prison staff can determine how and when to resume normal programming and avoid further incidents.  (Allison Decl. ¶ 27; Vasquez Decl. ¶ 19.)  Once the inmates who instigated the incident have been identified and removed from the general population and correctional staff determine it is safe to resume normal programming, a phased unlock may begin. (Allison Decl. ¶ 27; Vasquez Decl. ¶ 19.)  During a modified program, an unlock plan is developed to guide the return to full programming. (Allison Decl. ¶ 27; Vasquez Decl. ¶ 19.)

During the phased unlock, inmates are released, and privileges restored, in stages. (Allison Decl. ¶ 27; Vasquez Decl. ¶ 19.)  A determination is made regarding the inmates most likely to program successfully.  (Allison Decl. ¶ 27; Vasquez Decl. ¶ 19.)  Small groups of inmates may be released so that staff can monitor their conduct in a controlled environment and evaluate whether the planned unlock can proceed safely. (Allison Decl. ¶ 27; Vasquez Decl. ¶ 19.)

Once a modified program is implemented, the process of investigating and gathering intelligence begins. (Allison Decl. ¶ 28; Vasquez Decl. ¶ 20.)  The investigation process can be slow, time-consuming, and labor intensive. (Allison Decl. ¶ 28; Vasquez Decl. ¶ 20.)  Inmates and facility staff are interviewed to gather intelligence about the incident and to determine whether it is safe to return to normal programming. (Allison Decl. ¶ 28; Vasquez Decl. ¶ 20.)  The yards, cells, common areas, and other areas of the prison are searched thoroughly for evidence, weapons, and contraband. (Allison Decl. ¶ 28; Vasquez Decl. ¶ 20.)  Mail is screened for any information concerning planned violence. (Allison Decl. ¶ 28; Vasquez Decl. ¶ 20.)  The investigation can be delayed when weapons are discovered during the searches.  (Allison Decl. ¶ 29; Vasquez Decl. ¶ 21.)  The discovery of weapons creates additional issues that must be evaluated, including but not limited to, where the weapons came from, how they were made, when they were gathered, and their intended targets. (Allison Decl. ¶ 29; Vasquez Decl. ¶ 21.)

If another incident occurs during the unlock process, previously restored programs may be rescinded so an investigation of the new incident can be completed. (Allison Decl. ¶ 30; Vasquez Decl. ¶ 22.)  If it is determined that returning the inmates to normal programming would pose too great a risk, the modified program may be continued. (Allison Decl. ¶ 30; Vasquez Decl. ¶ 22.)  While some of the evidence gathered during the prior investigation is helpful, prison officials need to conduct a new investigation and assess the nature, scope, and

duration of the most recent threat to safety and institutional security. (Allison Decl. ¶ 30; Vasquez Decl. ¶ 22.)

During any modified program, there are weekly mandatory meetings with the Warden or designee, the Chief Deputy Warden, the Facility Captain, the Associate Warden, members from the Institutional Gang Investigation Unit, and any line-level correctional staff member with relevant information. (Allison Decl. ¶ 32; Vasquez Decl. ¶ 24.)   The attendees discuss the progress of the investigation, the status of the modified program, and the development of a plan to resume normal programming. (Allison Decl. ¶ 32; Vasquez Decl. ¶ 24.)   The Associate Director of Institutions for CDCR is apprised of the status of the lockdown or modified program via weekly PSR and bi-weekly conference calls. (Allison Decl. ¶ 32; Vasquez Decl. ¶ 24.)  Staff also communicates regularly with other institutions and with CDCR headquarters to compare intelligence, determine whether the threat is an isolated event or part of a larger plan, and to determine whether it is safe to return to normal programming. (Allison Decl. ¶ 32; Vasquez Decl. ¶ 24.)   Other prisons may also interview their inmates and monitor inmate communications for related intelligence. (Allison Decl. ¶ 32; Vasquez Decl. ¶ 24.)

When a group of inmates commits an assault, staff must determine whether the assault was an isolated incident or the beginning of a coordinated It is more difficult, labor intensive, and expensive to operate a prison during a modified program. (Allison Decl. ¶ 59; Vasquez Decl. ¶ 38.)   Typically, during normal programming, inmates assist staff as part of their work assignments, and they are allowed to report to the showers and some medical appointments without an escort. (Allison Decl. ¶ 59; Vasquez Decl. ¶ 38.)   During a modified program, correctional staff must deliver all meals to each inmate's cell, most work assignments are suspended, and inmates must be escorted to showers and medical appointments. (Allison Decl. ¶ 59; Vasquez Decl. ¶ 38.)

**HISTORIC RIVALRY BETWEEN HISPANIC GANGS AND DISRUPTIVE GROUPS IN CALIFORNIA'S PRISONS**

Prison gangs and disruptive groups are powerful, violent, and criminal organizations. (Valdez Decl. ¶ 4.)  Prison gangs include any gang that originated, and has its roots within, the prison system. (Valdez Decl. ¶ 5.)  The CDCR recognizes seven groups as prison gangs: the Mexican Mafia; Nuestra Familia; the Northern Structure; the Aryan Brotherhood; the Nazi Lowriders; the Texas Syndicate; and the Black Guerilla Family. (Valdez Decl. ¶ 5.)  "Disruptive groups" encompass any gang other than a prison gang, and the term generally refers to street gangs. (Valdez Decl. ¶ 6.)  Disruptive groups often form symbiotic relationships with one of the seven recognized prison gangs. (Valdez Decl. ¶ 7.)

Once in prison, all of the Mexican Mafia's street gang affiliates fall under the umbrella designation "Southern Hispanic" or "Sureño." (Valdez Decl. ¶ 9.)  CDCR officials originally defined the Southern Hispanic disruptive group as inmates from street gangs south of Bakersfield, but Southern Hispanic inmates are now being recruited and groomed by the Mexican Mafia in San Francisco, Eureka, Oregon, Washington, Hawaii, and as far away as Kansas and Oklahoma. (Valdez Decl. ¶ 10.)  133. There are inmates of all races and ethnicities who are designated as Southern Hispanics, and who choose to program with other Southern Hispanic inmates. (Martinez Depo. 91:6-2:5; Pl.'s Mot. to Compel, Nov. 19, 2012, ECF No. 31 at 3; Valdez Decl. ¶ 25.)

Like the Southern Hispanic disruptive group, the Northern Hispanic disruptive group has a detailed constitution and is structured like a military organization, complete with a ranking system, and assigned duties for its members, associates, and subordinates. (Valdez Decl. ¶ 22.)  Northern Hispanic inmates, or Norteños, are subservient to their parent organizations, the Nuestra Familia (NF) and the Northern Structure (NS), and Norteños are required to strictly comply with the two prison gangs' rules and policies. (Valdez Decl. ¶ 23.)  Most ethnically-

Hispanic inmates from Northern California choose to program and associate with other inmates in the Northern Hispanic disruptive group, and they must follow the orders of the NF/NS or risk gang-authorized retaliation. (Valdez Decl. ¶ 24.)   There are inmates of all races and ethnicities who are designated as Northern Hispanics, and who choose to program with other Northern Hispanic inmates. (Martinez Depo. 91:6-2:5; Pl.'s Mot. to Compel, Nov. 19, 2012, ECF No. 31 at 3; Valdez Decl. ¶ 25.)

The NF/NS and the Mexican Mafia have been sworn enemies since the late 1960s. (Valdez Decl. ¶ 27.)   The influence of these two prison gangs, and their subordinate disruptive groups, is pervasive throughout the state, and especially in Level IV facilities. (Valdez Decl. ¶ 27.)   Generally, when there is a riot involving multiple Sureños, prison officials coordinate an investigation of the incident with the prison's Investigative Services Unit (ISU), the Institutional Gang Investigations (IGI) Unit, and the Office of Correctional Safety (OCS) in Sacramento, to try and determine whether the incident was an isolated event, or if the violence was in furtherance of an order by the Mexican Mafia directing a much larger campaign of violence throughout the CDCR system. (Valdez Decl. ¶ 34.)   Because Southern Hispanic inmates are so closely allied with the Mexican Mafia, prison officials recognize that any particular incident of violence, regardless of the individuals involved in the actual violence, may have been directed by the Mexican Mafia. (Valdez Decl. ¶ 32.)   Based on the unusually cohesive nature of the Southern Hispanic disruptive group, whenever a housing facility is placed on modified program or lockdown because of an act of violence on the part of a few Sureños, all Sureños within the affected housing unit would have to be placed on lockdown or modified program pending the outcome of the investigation. (Valdez Decl. ¶ 35.)

### MODIFYING PROGRAMMING FOR ALL MEMBERS OF A RACIAL OR ETHNIC GROUP

Prisons, and housing facilities within prisons, are dynamic environments. (Allison

Decl. ¶ 49.)   Inmates segregate themselves along racial and ethnic lines, and they further subdivide themselves by their affiliation with particular prison gangs and disruptive groups. (Allison Decl. ¶ 49; Vasquez Decl. ¶ 32.)   It is not uncommon for inmates to hide or pass weapons, or attempt to carry out an assault, for another inmate. (Allison Decl. ¶ 49; Vasquez Decl. ¶ 32.)  Incidents that begin without racial animus often take on racial overtones. (Allison Decl. ¶ 50; Vasquez Decl. ¶ 33.)  A fight between inmates of different races that has nothing to do with race may be interpreted by other inmates as an act calling for retaliation against members of a participant's racial group. (Allison Decl. ¶ 50; Vasquez Decl. ¶ 33.)  It is not uncommon for inmates planning violence to target and threaten inmates of their same race. (Allison Decl. ¶ 51; Vasquez Decl. ¶ 34.)

On some occasions, when inmates planning violence realize that facility searches are ongoing and that the weapons they have hidden will eventually be discovered and confiscated, they sometimes threaten to harm other inmates of their same race to coerce them to move or hide weapons to prevent them from being discovered, or to assault other inmates or staff. (Allison Decl. ¶ 51; Vasquez Decl. ¶ 34.)  If the innocent inmate does not comply, the threats of violence may be carried out against him. (Allison Decl. ¶ 51; Vasquez Decl. ¶ 34.)  For this reason, CDCR alleges that it is sometimes necessary to lock down or place on modified program inmates who may be innocent in the triggering incident, in order to protect them from members of their own race. (Allison Decl. ¶ 51; Vasquez Decl. ¶ 34.)  Restrictions imposed on a particular racial or ethnic group are occasionally used until prison officials can determine whether the incident has a racial component or will likely lead to broader racial or ethnic violence. (Allison Decl. ¶ 52; Vasquez Decl. ¶ 35.)

Among Hispanic inmates, it is impossible to distinguish between Norteños, Sureños, Fresno Bulldogs, and Mexican Nationals—all Hispanic prison disruptive groups—based on sight

alone. (Allison Decl. ¶ 55.)  All general population inmates wear the same standard-issue prison uniform. (Allison Decl. ¶ 55; Martinez Depo. 105:9-14.) It is also impossible to tell by sight which inmates are affiliated with prison gangs and disruptive groups, and which inmates are non-affiliated. (Allison Decl. ¶ 55.)

In this case, Sureños were ordered to attack all Norteños on sight. (Allison Decl. ¶ 56.) Because it is virtually impossible to tell who is a Norteño and who is not based on visual cues alone, an attack-on-sight order can result in an attack on any Hispanic-looking inmate who is unfamiliar to the assailant. (Allison Decl. ¶ 56.)  That Hispanic victim might be a Norteño, but he could also be a Fresno Bulldog or a Mexican National. (Allison Decl. ¶ 56.)  Or the victim could be non-affiliated, which means he chooses to program without aligning himself with any prison gang or disruptive group. (Allison Decl. ¶ 56.)  The victim might not even be Hispanic, but he could be mistaken for a Hispanic belonging to the rival disruptive group. (Allison Decl. ¶ 56.) When prison officials face this type of threat of race-based violence, prison official allege that the only way to protect uninvolved third parties, not to mention the intended recipients of the violence, is to modify programming for all members of that race or ethnicity until the danger is resolved. (Allison Decl. ¶ 57.)

**THE JUNE 21, 2009 RIOT**

On Sunday, June 21, 2009, a set of riots occurred simultaneously on Facility C's Recreation Yards #1 and #2, as well as in the dayrooms of housing units C4, C6, and C8. (Allison Decl. ¶ 2 & Ex. B at 1; Vasquez Decl. ¶ 2.)  Seventy-five inmates were involved in the riots. (Allison Decl. ¶ 2 & Ex. B at 1; Vasquez Decl. ¶ 2.)  The incident appeared to prison officials to be an organized attack by members of the Southern Hispanic disruptive group against members of the Northern Hispanic disruptive group. (Allison Decl. ¶ 2 & Ex. B at 1; Vasquez Decl. ¶ 2.)  Three African-American inmates and two Mexican Nationals were also involved.

(Allison Decl. ¶ 2 & Ex. B at 1; Vasquez Decl. ¶ 2.)  Responding staff used pepper spray, 13 direct impact rounds from the 40mm launcher, and two warning shots from a Mini-14 rifle to suppress the riots. (Allison Decl., Ex. B at 1.)  Correctional staff from other housing facilities at SATF were called in to assist. (Allison Decl., Ex. B at 1.)  After the violence was contained, investigators found 29 inmate-manufactured weapons on the scene. (Allison Decl. ¶ 2 & Ex. B at 1; Vasquez Decl. ¶ 2.)  Eleven Northern Hispanic inmates were transferred to an outside hospital due to serious bodily injuries. (Allison Decl. ¶ 2 & Ex. B at 1; Vasquez Decl. ¶ 2.)  Four of them had inmate-manufactured weapons concealed in their anal cavities when they arrived at the hospital. (Allison Decl. ¶ 2 & Ex. B at 1; Vasquez Decl. ¶ 2.)

**IMPLEMENTING THE JUNE 22, 2009 MODIFIED PROGRAM**

On Monday, June 22, 2009, Warden Clark placed all inmates on Facility C on a modified program, pending the outcome of an investigation into the previous day's incidents. (Allison Decl. ¶ 2 & Ex. A at PSR01.)  The modified program was assigned Program Status Number, SATF-03-09-06-0235, and it was referred to by that number afterwards. (Allison Decl. ¶ 5 & Ex. A at PSR01.)  Nearly all inmate privileges were restricted, including outdoor recreation, dayroom activities, canteen, phone calls, and visiting, among others. (Allison Decl., Ex. A at PSR01.)

Within days of the riots, correctional staff began a massive investigation that spanned months. (Allison Decl. ¶ 3.)  The investigation sought to determine the riot's causes, as well as the potential for additional violence between Sureños and Norteños. (Allison Decl. ¶ 3.)  In the course of the investigation, staff discovered hundreds of additional security threats. (Allison Decl. ¶ 3.)  Some were later confirmed, and some were not. (Allison Decl. ¶ 3.)  All security threats required further investigation, however. (Allison Decl. ¶ 3.)  There were also numerous additional incidents of violence between the Sureños and Norteños.  (Allison Decl. ¶ 3.)

1   Investigators later determined that the June 21, 2009 riots stemmed from the death of a Southern

2   Hispanic inmate perpetrated by a Northern Hispanic inmate at Kern Valley State Prison in April

3   2009. (Allison Decl. ¶ 4 & Ex. B at 1.)

4           Throughout the entire modified program, Facility Captain Vasquez maintained a record

5   of significant events, as they pertained to the investigation, newly discovered threats, and steps

6   taken to return Facility C to normal programming. (Allison Decl. ¶ 35 & Exs. B, C; Vasquez

7   Decl. ¶ 26 & Exs. A, B.)  Captain Vasquez later detailed all of these significant events in two

8   memoranda, dated August 6, 2010 and April 3, 2011, which he forwarded to Warden Allison for

9   review. (Allison Decl. ¶ 35 & Exs. B, C; Vasquez Decl. ¶ 26 & Exs. A, B.)  These memoranda

10  contained approximately 151, and 111, separate event entries, respectively. (Allison Decl. ¶ 35 &

11  Exs. B, C; Vasquez Decl. ¶ 26 & Exs. A, B.)  Captain Vasquez briefed Warden Allison on each

12  of these events as they occurred, and the two memoranda accurately reflect the information that

13  she relied on when making decisions concerning the modified program, including whether to

14  maintain the restrictions on outdoor exercise. (Allison Decl. ¶ 35; Vasquez Decl. ¶ 2.)  Captain

15  Vasquez's memoranda show that on at least 15 occasions, staff found Southern Hispanics in

16  possession of inmate-manufactured weapons. These are reflected in the entries for the following

17  dates: August 16, September 10, September 13, October 25, October 27, and December 10,

18  2009, and February 13, March 30, April 28, May 11, May 18, June 9, August 18, September 4,

19  and September 13, 2010. (Allison Decl., Ex. B at 4-5, 7, 9-12, Ex. C at 1-2.)  Captain Vasquez's

20  memoranda also show that there were approximately 8 instances when Southern Hispanic and

21  Northern Hispanic inmates asked to be removed from the general population for safety concerns.

22  These events are reflected in the entries for the following dates: July 24, 2009, and January 20,

23  January 23, February 7, June 9, June 11, August 19, and September 16, 2010. (Allison Decl., Ex.

24  B at 3, 8, 12, Ex. C at 1-2.)   Captain Vasquez's memoranda also show that there were

18

approximately 8 in-cell assaults between Southern Hispanic cell-mates during the complaint period. These occurred on the following dates: June 26, November 2, November 13, and November 27, 2010, and March 29, May 11, June 7, and August 6, 2010. (Allison Decl., Ex. B at 2, 5-6, 10-12, Ex. C at 1.)

During a modified program like the one at issue, fights between cell-mates are a byproduct of the tension that comes with being housed in close quarters for an extended period of time. (Allison Decl. ¶ 38.)  Throughout the modified program, Facility C's inmate population was interviewed continuously, and staff conducted ongoing searches of the inmates' cells and throughout the rest of the grounds. (Allison Decl. ¶ 39.) Many of these efforts produced intelligence that required additional investigation. (Allison Decl. ¶ 39.)  On several occasions, metal stock—which can be used to fashion weapons—was found to be missing from the facility. This happened, specifically, on September 2, and October 27, 2009, and on August 30, 2010. (Allison Decl. ¶ 40 & Ex. B at 4, 5, Ex. C at 2.)  This required additional searches and interviews. (Allison Decl. ¶ 40.)  Warden Allison gradually loosened the restrictions on the modified program.  (Allison Decl. ¶ 41.)

On July 20, 2009, a lockdown meeting was held, and Warden Allison directed that Facility C's inmates designated as "Others" would return to normal programming with the exception of no dayroom activities, while the rest of the inmate population remained on modified program. (Allison Decl. ¶ 41.)  July 20, 2009 was the first time that SATF-03-09-06-0235 differentiated among Facility C's inmates. (Allison Decl. ¶ 41; Martinez Depo. 42:8-13.)  In the months that followed, Warden Allison made several attempts at incrementally lifting the modified program's restrictions. (Allison Decl. ¶ 42.)  On August 4, 2009, the modified program was amended to allow African-Americans, Hispanics, and Whites to receive quarterly packages together while in waist restraints. (Allison Decl. ¶ 42.)  Several days later, these same groups of

inmates were allowed to receive canteen together while in waist restraints. (Allison Decl. ¶ 42.) About one week later, however, on August 18, 2009, Northern and Southern Hispanics were involved in a fight in the Facility C medical clinic. (Allison Decl. ¶ 42.)  On January 21, 2010, a riot occurred on SATF's Facility B between the Norteños and Sureños in all three of that facility's housing units. (Allison Decl. ¶ 43.)  Facility B is a Level II general population facility. (Allison Decl. ¶ 43.) The fact that a riot occurred on this second, medium-security facility made prison official believe that the Norteño/Sureño conflict was part of a plan of coordinated violence that extended beyond Facility C. (Allison Decl. ¶ 43.)

In July 2010, the Hispanic representatives from Facility C's Inmate Advisory Council (IAC) were scheduled to tour the housing units. (Allison Decl. ¶ 44.)  When the inmates entered the first housing unit, the Southern Hispanic and Mexican National IAC representatives assaulted the Northern Hispanic representative with a weapon, causing him serious bodily injury. (Allison Decl. ¶ 44.)  On August 5, 2010, the Northern Hispanic inmates on Facility C were returned to normal programming. (Allison Decl. ¶ 45.)   Modified program SATF-03-09-06-0235 only applied to Southern Hispanics and Mexican Nationals thereafter. (Allison Decl. ¶ 45.)

**WARDEN ALLISON'S DECISION TO MAINTAIN THE MODIFIED PROGRAM**

Warden Allison was not personally involved in conducting the investigation into the incidents that triggered the modified program at issue. (Allison Decl. ¶ 8.)  Instead, she relied on the investigations, analysis, and opinions of her staff. (Allison Decl. ¶ 8.)  This information included, but was not limited to, the status of any ongoing investigations, the evidence collected, the effectiveness of the restrictions imposed as part of the modified program, the likelihood that violence would occur without the restrictions in place, the appropriateness of the scope of the restrictions, and the prospects and timetable for a phased unlock to return to normal programming. (Allison Decl. ¶ 8.)  To this end, Warden Allison attended numerous weekly threat

assessment meetings in which she and her staff discussed the modified program, the status of the investigation, and the threats to safety and security in Facility C and the institution generally, among other things.  (Allison Decl. ¶ 9.)

In addition to these weekly meetings, Warden Allison also held smaller, informal meetings with members of her executive staff every morning, including Defendants Diaz, Sherman, and Wan, in which she and her staff discussed the plan of the day. (Allison Decl. ¶ 34.) Because the modified program on Facility C was one of the most serious issues Warden Allison was managing, she insisted that Facility Captain Vasquez attend these daily briefings. (Allison Decl. ¶ 34.)  During these daily meetings, Captain Vasquez briefed Warden Allison on each of the significant events itemized in his August 2010 and April 2011 memoranda, and she was aware of each event shortly after it occurred. (Allison Decl. ¶ 35.)   The itemized entries in Captain Vasquez's two memoranda accurately reflect the information that Warden Allison and her executive staff relied on when making decisions and recommendations about the modified program. (Allison Decl. ¶ 35.)  Based on the updates that Captain Vasquez provided to Warden Allison at the daily and weekly meetings described above, Warden Allison did not believe that it was safe to return Facility C's Southern Hispanic inmate population to normal programming at any time from June 22, 2009 to October 13, 2010 (the complaint period), and she decided that it was necessary to maintain the restrictions on outdoor recreation during that time. (Allison Decl. ¶ 36.)

**THE MODIFIED PROGRAM'S RESTRICTIONS ON OUTDOOR EXERCISE**

In Warden Allison's experience, among all of the programming activities that are suspended during a lockdown or modified program, it is most difficult to determine when exercise programs can safely be resumed. (Allison Decl. ¶ 48.)  Inmates have the greatest access to each other on the exercise yards, which is typically where most assaults occur. (Allison Decl.

¶ 48.)  Self-imposed ethnic divisions are especially pronounced on the exercise yards because the various ethnic groups often claim areas of the yard as their "turf." (Allison Decl. ¶ 48.)  The number of inmates on a yard greatly outnumbers the number of correctional staff assigned to monitor the area, usually by a factor of 30 to 1. (Allison Decl. ¶ 48.)  To the extent that Plaintiff claims that he and other inmates affected by the modified program should have been allowed to use the small concrete yards for exercise during the modified program period, several inmates from Facility C's IAC made this same request to Warden Allison during the modified program in 2009-2010. (Allison Decl. ¶ 58.)  This was not an option in Warden Allison's view for several reasons. (Allison Decl. ¶ 58.)  First, since SATF opened in 1995, the concrete yards have never been used for general population programming. (Allison Decl. ¶ 58(a).)  The concrete yards at SATF were only designed for, and have only been used by, Administrative Segregation overflow and Security Housing Unit inmates. (Allison Decl. ¶ 58(a).)  Second, given the number of inmates who were subject to the modified program, and the fact that the concrete yards (which are about the size of a basketball court) could probably only hold 10-20 inmates at any given time, an exercise program in the concrete yards would have needed to be running continuously (24-hours each day) to accommodate everyone. (Allison Decl. ¶ 58(b).)  This would have interfered with the ongoing investigation, and logistically, it was not reasonable or feasible under the conditions. (Allison Decl. ¶ 58(b).)  Third, placing 10-20 Level IV inmates—affiliated and non-affiliated, of diverse races and ethnicities, and from separate prison gangs and disruptive groups—in an enclosed space the size of a basketball court could have been disastrous. (Allison Decl. ¶ 58(c).)  If an inmate were assaulted by another inmate or group of inmates on the main recreation yard, he could try to run from the danger. (Allison Decl. ¶ 58(c).)  But if an inmate were attacked in one of the enclosed concrete yards, he would have no means of escape; he would be trapped. (Allison Decl. ¶ 58(c).)

Warden Allison was responsible for protecting the inmates in her custody, and she would never have subjected any inmates to the unreasonable risk of harm that would be created by programming small groups of inmates in the concrete yards. (Allison Decl. ¶ 58(c).)  To the extent that the IAC members asked prison staff to divide inmates along racial and ethnic lines, and allow them to use the concrete yards in segregated groups, this would not have been sound penologically, and Warden Allison did not allow it at SATF for several reasons.  (Allison Decl. ¶ 58(d).)  General population inmates are expected to program successfully with other inmates of diverse races and ethnicities. (Allison Decl. ¶ 58(d)(i).)   This is one of CDCR's core rehabilitative functions. (Allison Decl. ¶ 58(d)(i).)  Inmates already self-segregate along racial and ethnic lines, but Warden Allison was unwilling to allow SATF (and by extension, the State of California) to participate in this discriminatory practice, which would have run counter to SATF's programming goals. (Allison Decl. ¶ 58(d)(i).)

Warden Allison knew that other institutions, like Kern Valley State Prison, had experimented with similar programs with negative results. (Allison Decl. ¶ 58(d)(ii).)  Where this practice had been tried, Warden Allison knew that in some instances, after the inmates became accustomed to recreating exclusively with their own racial or ethnic group in the concrete yards, they refused to program with inmates of other races in the main exercise yards once the modified program was lifted, and levels of violence actually increased when the inmates returned to integrated programming. (Allison Decl. ¶ 58(d)(iii).)  Warden Allison believed through personal experience that when inmates are allowed to use the concrete yards in segregated groups (whether by race or gang affiliation), they become complacent in that routine—they believe that they will be safe if allowed to program exclusively with members of their race or gang affiliation—and they lose all incentive to work towards normal programming, which, of course, is optimal for rehabilitative purposes. (Allison Decl. ¶ 58(d)(iv).)  Last, because Facility C's

inmate population shared several common spaces—such as dental, medical, visiting, and the chapel—Warden Allison used the inmates' behavior on the main recreation yards as a barometer for how they would interact in the shared service areas. (Allison Decl. ¶ 58(d)(v).)  Running a segregated exercise program in the concrete yards would have removed this critical tool for predicting inmate behavior in the common areas. (Allison Decl. ¶ 58(d)(v).)

All restrictions imposed on inmate access to the main exercise yards during modified programming were imposed with the belief that the restrictions would be effective in preventing further acts of violence, and would help to restore order. (Allison Decl. ¶ 61; Diaz Decl. ¶ 39; Sherman Decl. ¶ 38; Vasquez Decl. ¶ 40; Wan Decl. ¶ 38.)  Based upon the reports they received, Warden Allison and the rest of her executive staff believed that the modified program: (1) was necessary to protect the lives of correctional staff and inmates because of significant and credible threats of continued violence; (2) was a response to severe and unusually high levels of violence at the prison; (3) was designed solely to protect the lives and safety of inmates and correctional staff members, who they believed were in imminent danger of violent assaults; (4) did not last any longer than was necessary to protect the lives and safety of inmates and correctional staff; (5) was not intended to prejudice or harass anyone; and (6) did not violate any statutory or constitutional rights. (Allison Decl. ¶ 64; Diaz Decl. ¶ 42; Sherman Decl. ¶ 41; Vasquez Decl. ¶ 43; Wan Decl. ¶ 41.)  Plaintiff has no personal knowledge about the security threats that Warden Allison and her executive staff were aware of when they were making decisions and recommendations concerning the modified program. (Martinez Depo. 36:8-16, 70:11-71:10, 71:18-72:8, 103:4:17.)

///

///

///

III.   **DISCUSSION**

    A.    <u>**42 U.S.C. § 1983 Causation**</u>

        1.    **Legal Standard**

Section 1983 provides a cause of action against any person who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983; *Filarsky v. Delia*, 132 S. Ct. 1657, 1661 (2012); *Nelson v. Campbell*, 541 U.S. 637, 643 (2004); *Nurre v. Whitehead*, 580 F.3d 1087, 1092 (9th Cir. 2009). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978). "In a § 1983 action, the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury. To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." *Harper v. City of L.A.*, 533 F.3d 1010, 1026 (9th Cir. 2008) (internal citations omitted). Proximate cause requires "'some direct relation between the injury asserted and the injurious conduct alleged.'" *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 130 S.Ct. 983, 989, 991 (2010) (quoting *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).

        2.    **Findings**

As employees of CDCR, Defendants acted under color of state law in executing the duties of their positions relating to the implementation and continuation of lockdowns at SATF.

Defendants argue that judgment should be in favor of Defendants Hernandez, Moreno, Peterson, Tolson, Diaz, Sherman, Vasquez, and Wan because they did not cause Plaintiff's alleged injury as required for § 1983 liability, since they did not control the duration or scope of

the lockdowns.  Defendants assert only Defendants Clark and Allison, in their capacity as Warden, had the authority to modify or terminate the lockdowns.

Defendants Hernandez, Moreno, Peterson, Tolson, Diaz, Sherman, Vasquez, and Wan "participate[d] in [Defendant Clark and Defendant Allison]'s affirmative acts," through giving advice, expertise and recommendations to enable them to approve of the scope and duration of the lockdowns. *See Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978). Defendant Allison stated in her declaration that she relied on the investigations, analysis, and opinion of her staff related to the modified program. (Allison Decl. ¶ 8). It is clear that Defendants Hernandez, Moreno, Peterson, Tolson, Diaz, Sherman, Vasquez, and Wan were a part of Defendant Clark and Allison's decision making process to implement and continue the lockdown.  *See Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978).  Accordingly, the Court finds that the conduct of Defendants Hernandez, Moreno, Peterson, Tolson, Diaz, Sherman, Vasquez, and Wan sufficiently satisfies the causation requirement for section 1983.

**B.** **Eighth Amendment—Conditions and Confinement**

**1.** **Legal Standard**

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment, but also from inhumane conditions of confinement.  *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994) and *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)) (quotation marks omitted).  While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain.  *Morgan*, 465 F.3d at 1045 (citing *Rhodes*, 452 U.S. at 347) (quotation marks omitted).  Thus, conditions which are devoid of legitimate penological purpose or contrary to evolving standards of decency that mark the progress of a maturing society violate the Eighth Amendment.  *Morgan*, 465 F.3d at

1045 (quotation marks and citations omitted); *Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Rhodes*, 452 U.S. at 346.

Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety, *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted), but not every injury that a prisoner sustains while in prison represents a constitutional violation. *Morgan*, 465 F.3d at 1045 (quotation marks omitted). To maintain an Eighth Amendment claim, a prisoner must show that prison officials were deliberately indifferent to a substantial risk of harm to his health or safety. *E.g., Farmer*, 511 U.S. at 847; *Thomas v. Ponder*, 611 F.3d 1144, 1151-52 (9th Cir. 2010); *Foster v. Runnels*, 554 F.3d 807, 812-14 (9th Cir. 2009); *Morgan*, 465 F.3d at 1045; *Johnson*, 217 F.3d at 731; *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). A prisoner's claim does not rise to the level of an Eighth Amendment violation unless (1) "the prison official deprived the prisoner of the 'minimal civilized measure of life's necessities,'" and (2) "the prison official 'acted with deliberate indifference in doing so.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted)).

Deliberate indifference requires a showing that prison officials were aware of a "substantial risk of serious harm" to an inmate's health or safety and that there was no "reasonable justification for the deprivation, in spite of that risk." *Thomas*, 611 F.3d at 1150 (quoting *Farmer*, 511 U.S. at 844). The circumstances, nature, and duration of the deprivations are critical in determining whether the conditions complained of are grave enough to form the basis of a viable Eighth Amendment claim." *Johnson*, 217 F.3d at 731.

## 2.    Findings

Plaintiff was on lockdown and denied outdoor exercise from June 22, 2009 to October 13, 2010, i.e., for approximately sixteen months. The riots in Facility C involving seventy-five

inmates justify the initial decision to impose the lockdown. It is undisputed that following this incident, searches and interviews of inmates were conducted. However, the record contains no specific evidence regarding why it was determined that the emergency which justified the lockdown in the first place no longer existed on October 13, 2010, as opposed to several months, for example. Rather, the undisputed facts only generally provide that interviews and searches occurred. Because defendants have not provided evidence specifically demonstrating that the security emergency existed until October 13, 2010, the court does not find that they have met their initial burden of demonstrating the absence of a genuine issue as to this material fact. To hold to the contrary would be to endorse a blank check with respect to time for which exercise is deprived, i.e., "investigation continues" would sanction whatever period prison officials in their unfettered discretion would choose.  Accordingly, the Court recommends denying Defendants' motion for summary judgment on this basis.

**C.**   **Equal Protection**

**1.**   **Legal Standard**

The Equal Protection Clause requires that persons who are similarly situated be treated alike.  *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249 (1985); *Hartmann v. California Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1123 (9th Cir. 2013); *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013); *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008).  To state a claim, Plaintiff must show that Defendants intentionally discriminated against him based on his membership in a protected class.   *Hartmann*, 707 F.3d at 1123; *Furnace*, 705 F.3d at 1030; *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003); *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001).

Prisoners are protected from racial discrimination by the Equal Protection Clause, *Walker v. Gomez*, 370 F.3d 969, 973 (2004), and express racial classifications are immediately suspect,

28

*Johnson v. California*, 543 U.S. 499, 509, 125 S.Ct. 1141, 1146 (2005).  Racial classifications are subject to strict scrutiny, and the government bears the burden of proving that the classification was narrowly tailored to serve a compelling government interest.  *Johnson*, 543 U.S. at 505.  Modified programs that do not apply equally to all inmates can survive strict scrutiny as a matter of law. *Hurd v. Garcia*, 454 F. Supp. 2d 1032, 1052-53 (S.D. Cal. 2006) (finding the race-based security measure of keeping all inmates of one race on lockdown as being narrowly tailored and implemented to resolve the compelling government interest of restoring prison security and discipline); *Larry v. Tilton, 09-CV-0950-JLS WVG,* 2011 WL 4501396 (S.D. Cal. Mar. 3, 2011) report and recommendation adopted, 09-CV-00950 JLS WVG, 2011 WL 4501378 (S.D. Cal. Sept. 28, 2011).

### 2.      Findings

No dispute exists that the state has a compelling interest in prison security, nor can there be such a dispute. *See Greene v. Solano Cnty. Jail,* 513 F.3d 982, 988 (9th Cir.2008) (citing *Cutter v. Wilkinson,* 544 U.S. 709, 725 n. 13, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005)). Indeed, "deference is due to institutional officials' expertise in this area." *Cutter,* 544 U.S. at 725 n. 13. The only issue that remains is whether the modified programs instituted here were narrowly tailored to further that interest. *See Warsoldier v. Woodford,* 418 F.3d 989, 998 (9th Cir.2005). The undersigned concludes that they were.

Defendants' evidence establishes that an emergency situation existed in SATF's Facility C.  On Sunday, June 21, 2009, a set of riots occurred simultaneously on Facility C's Recreation Yards that involved seventy-five inmates.  Not only was the attack violent, it demonstrated that multiple inmates had worked in concert to plan and carry out the attack. The incident appeared to be an organized attack by members of the Southern Hispanic disruptive group against members of the Northern Hispanic disruptive group.  Warden Clark placed all inmates on Facility C on a

modified program, pending the outcome of an investigation into the previous day's incidents. The initial facility-wide lockdown was aimed at establishing total control over the inmates to prevent future attacks while the prison investigated the incident. The initial lockdown was not race-based and does not violate the Fourteenth Amendment.

During the course of the lockdown various incidents occurred that led Warden Allison to believe that maintaining the lockdowns for Hispanics was necessary for safety reasons.

• June 29, 2009 – ISU reviewed outgoing mail which reveals the Blacks were disrespected by the Southern Hispanics and it's going to be all bad. Outgoing letter by a Southern Hispanic reveals we're at war with the Northern Hispanics and there's more to come. Outgoing letter by a Southern Hispanic reveals there's a state wide war going on between the North and South.

• July 24, 2009 – Facility C confidential report of a Southern Hispanic inmate requesting removal from the yard due to safety concerns reveals that he received a kite indicating it was on sight (targeted for assault) with the Blacks and North.

• September 2, 2009 – Possession of weapons on four Northern Hispanic inmates while on Contraband Watch.

• September 4, 2009 – A lockdown meeting was held, and it was decided to place the entire inmate population on modified program due to metal stock was discovered missing from the light fixtures in the cells of housing unit C8 on September 2, 2009.

• September 10, 2009 – Possession of weapon on a Southern Hispanic inmate in the housing unit.

• September 13, 2009 – Possession of weapon on two Southern Hispanic inmates in the housing unit.

• October 16, 2009 – Two Northern Hispanic restrained inmates were being escorted into

housing unit C1 B-section from medical when the cell door of two Southern Hispanic inmates was accidentally opened and the Southern Hispanics commence to assault the restrained Northerners.

• October 27, 2009 – Possession of a weapon, two (2) inmate manufactured hand cuff keys and two (2) razor blades were discovered on a Southern Hispanic.

• November 4, 2009 – Approximately nine Southern Hispanic inmates attacked two Northern Hispanic inmates in A-section of housing unit C8. All inmates were in restraints and sitting in the dayroom waiting for their cells to be searched when one of the Southerners was able to free his hand from the hand cuffs and attacked the Northerners. All the Southerners were involved in the assault.

• November 16, 2009 – Confidential information obtained by facility staff indicating a "kite" (note) reveals that the Southern Hispanic inmates have a "Green Light" (assault on sight) on the Black inmates.

• December 18, 2009 – Interviews conducted in housing unit C8 regarding possible assaults on staff.

• January 14, 2010 – Southern Hispanic inmate removed from facility for safety concerns and is requesting Sensitive Needs placement. Confidential information obtained indicating that it is mandatory for the Southern Hispanic inmates to have weapons and during medical escorts to carry hand cuff keys and priority kites (notes).

• January 18, 2010 – Southern Hispanic inmate removed from facility for safety concerns and is requesting Sensitive Needs placement. Confidential information obtained indicating that "kites" (notes) were being passed between the Southern Hispanic inmates on Facility C which instructed all Southern Hispanics to attempt to escape from any restraints (handcuffs or waist restraints) for the purpose of assaulting the Northern

Hispanic inmates.

• January 21, 2010 – Riot occurred on Facility B, level-II general population yard between the Northern Hispanic and Southern Hispanic inmates in all three housing units.

• February 9, 2010 – Resisting a Peace Officer resulting in UOF [use of force] occurred with five (5) Southern Hispanic inmates in the housing units.

• April 6, 2010 – Facility C staff discovered "kite" (note) on a Southern Hispanic inmate and the note reveals the Southern Hispanics are still on "War" mode with the Northern Hispanics.

• April 13, 2010 – Assault on a Peace Officer occurred in housing unit C8 by two Southern Hispanic inmates.

• April 14, 2010 – Facility staff discovered bindles, drugs, cellular phones, inmate manufactured cuff keys and "kites" (notes) and eight (8) Southern Hispanic inmates were placed on Contraband Watch.

• June 7, 2010 – Attempted Murder of an Inmate occurred in cell between two Southern Hispanics.

• June 21, 2010 – During ASU Institution Classification Committee, two Northern Hispanic drop out inmates and one White (pending SNY) inmates were asked by the Facility Captain regarding the North and South situation and all three inmates replied that it's ongoing and both sides are unable to program together on the same yard.

• July 27, 2010 – The Hispanic IAC [Inmate Advisory Council] representatives touring unrestrained but escorted. Upon entering the first section of the first housing unit on the tour, the Southern Hispanic IAC and the Mexican National IAC assaulted the Northern Hispanic IAC with a weapon causing serious bodily injury resulting in the UOF by staff.

• August 24, 2010 – A riot occurred on Facility 'A' in the housing units between the

Northern Hispanic and Southern Hispanic inmates.

• September 16, 2010 – Southern Hispanic, placed in ASU for safety concerns . . . states during administrative hearing . . . that the Southern Hispanic inmate population will not allow the Northern Hispanic inmates to walk the yard.

The above examples presented by Defendants amply demonstrate that the race-based security measures complained of by Plaintiff were narrowly tailored and were implemented to resolve the compelling government interest of restoring prison security and discipline. See *Johnson v. California*, 125 S.Ct. at 1150, citing *Lee v. Washington*, 88 S.Ct. 994

Plaintiff has failed to raise a triable issue of fact that he was subjected to race discrimination. Inmates of all races were on lock down status initially. Hispanic inmates in Facility C were continued on lock down status to protect that class of inmates from violence while prison officials investigated the ongoing violence flowing from the Norteño/Sureño conflict.  Prison official knew that there was a standing order directing all Sureños to attack all Norteños on sight.  Plaintiff provides no persuasive evidence that Defendants' actions were not narrowly tailored and taken absent the compelling government interest of restoring prison security and discipline. Therefore, Plaintiff has not met his burden of demonstrating the existence of a material factual dispute. Accordingly, Defendants are entitled to judgment as a matter of law on this claim and it is recommended that Defendants' motion for summary judgment on this ground be granted.

///

///

///

### D.   Qualified Immunity—Conditions and Confinement[5]

#### 1.   Legal Standard

The doctrine of qualified immunity protects government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   To determine if an official is entitled to qualified immunity the court uses a two part inquiry.   *Saucier v. Katz,* 533 U.S. 194, 200 (2001).   The court determines if the facts as alleged state a violation of a constitutional right and if the right is clearly established so that a reasonable official would have known that his conduct was unlawful.   *Saucier*, 533 U.S. at 200.   A district court is "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.   The inquiry as to whether the right was clearly established is "solely a question of law for the judge."   *Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting *Tortu v. Las Vegas Metro. Police Dep't.* 556 F.3d 1075, 1085 (9th Cir. 2009)).   In resolving the issue of qualified immunity, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff. *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003).

#### 2.   Findings

As discussed above, the Court has found that there is a triable issue regarding whether the lockdowns were continued with deliberate indifference to Plaintiff's right to outdoor exercise. Thus, the second prong requires the court to determine if the law was clearly established at the

---

[5]  Because the Court grants Defendants' motion regarding equal protection based on the foregoing analysis, the Court does not reach Defendants' argument that they are entitled to qualified immunity on the equal protection claim.

1    time Plaintiff was subjected to the modified program.

2           It is not clearly established exactly how or when prison officials must lift a lockdown or

3    modified program implemented in response to threats to the safety and security of the institution

4    arising from riots or information that inmates plan to assault staff.  *Noble v. Adams*, 646 F.3d

5    1138, 1143 (9th Cir. 2011); *Norwood v. Vance*, 591 F.3d 1062, 1070 (9th Cir. 2009).  As

6    *Norwood* states, "[w]hen violence rises to unusually high levels, prison officials can reasonably

7    believe it is lawful to temporarily restrict outdoor exercise to help bring the violence under

8    control." Norwood, 591 F.3d at 1069. In light of the undisputed evidence regarding the reasons

9    for the lockdowns/modified programs, the investigatory steps undertaken in responding to the

10   events, and that prison officials lifted lockdowns/modified programs in stages depending upon

11   the results of the investigations, it would not have been clear to a reasonable officer that

12   restricting an inmate's outdoor exercise in conjunction with the lockdowns/modified programs

13   during investigations at issue here was unlawful.  Therefore, Defendants are entitled to qualified

14   immunity for the lockdown instituted in June 2009.   Accordingly, the Court recommends

15   granting Defendants motion for summary judgment as to the Eighth Amendment claim on

16   qualified immunity grounds.

17   **IV.     CONCLUSION AND RECOMMENDATION**

18          In conclusion, the Court finds that Defendants are entitled to summary judgment on 1)

19   the Eighth Amendment conditions and confinement claim on the basis of qualified immunity and

20   2) the equal protection claim as a matter of law.   Accordingly, the Court HEREBY

21   RECOMMENDS that Defendants' motion for summary judgment, filed on July 15, 2013, be

22   GRANTED, thus concluding this action in its entirety.

23          These Findings and Recommendations will be submitted to the United States District

24   Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within

25   fourteen (14) days after being served with these Findings and Recommendations, the parties may

file written objections with the Court.  Local Rule 304(b).  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **March 14, 2014**                              /s/ *Dennis L. Beck*
                                                UNITED STATES MAGISTRATE JUDGE